1  JOHNSON BOTTINI, LLP
   FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
2  DEREK J. WILSON, Cal. Bar No. 250309
   655 West Broadway, Suite 1400
3  San Diego, California 92101
   Telephone: 619/230-0063
4  Facsimile: 619/233-5535

5  Attorneys for Plaintiffs    E-filing

**FILED**

MAR – 5 2008

**RICHARD W. WIEKING**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RS

6

7            UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

CV 08    1301

9  Mary Lemmond and Wandell Everett,    )    No.
   Derivatively On Behalf of VeriFone Holdings,  )
10 Inc.                                 )
                                        )    SHAREHOLDER DERIVATIVE
11              Plaintiffs,             )    COMPLAINT
                                        )
12      vs.                             )
                                        )    DEMAND FOR JURY TRIAL
13 DOUGLAS G. BERGERON,                 )
   BARRY ZWARENSTEIN,                   )
14 JESSE ADAMS.                         )
   ISAAC ANGEL,                         )
15 ELMORE WALLER,                       )
   COLLIN E. ROCHE,                     )
16 JAMES C. CASTLE,                     )
   LESLIE G. DENEND,                    )
17 ALEX W. HART,                        )
   ROBERT B. HENSKE,                    )
18 CHARLES R. RINEHART,                 )
   EITAN RAFF,                          )
19 WILLIAM G. ATKINSON,                 )
   CRAIG A. BONDY,                      )
20 GTCR GOLDER RAUNER, LLC,             )
   and DOES 1-25, inclusive,           )
21                                      )
                Defendants,             )
22                                      )
        -and-                           )
23                                      )
   VERIFONE HOLDINGS, INC., a Delaware  )
24 Corporation,                         )
                                        )
25              Nominal Defendant.      )

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

## SUMMARY AND OVERVIEW

1.     This is a shareholder derivative complaint against officers and directors of VeriFone Holdings, Inc. ("VeriFone" or the "Company") concerning wrongdoing that occurred between September 1, 2006 and November 30, 2007 (the "Relevant Period"). Plaintiffs assert state law claims for breach of fiduciary duty against defendants.

2.     VeriFone designs, markets, and services transaction automation systems that enable secure electronic payments among consumers, merchants, and financial institutions.

3.     On December 3, 2007, VeriFone announced that following a review by and on the recommendation of management, the Company's unaudited interim financial statements for the three months ended January 31, 2007, the three and six months ended April 30, 2007, and the three and nine months ended July 31, 2007 should no longer be relied upon, principally due to errors in accounting related to the valuation of in-transit inventory and allocation of manufacturing and distribution overhead to inventory. As a result of the false financial statements previously filed by VeriFone, the Company announced that it was delaying the filing of its Annual Report on Form 10-K for the fiscal year ending October 31, 2007. The Company anticipates that the restatement will result in a reduction of reported inventories that amounted to $30 million at July 31, 2007 and a reduction to previously-reported pre-tax income aggregating approximately $30 million for the interim periods through July 31, 2007.

4.     In its December 3, 2007 revelation of false financial statements, VeriFone also stated that when the Company eventually files the 2007 Form 10-K, and files amended financial statements for previous periods to correct admitted accounting errors, "*management expects VeriFone to report one or more material weaknesses in VeriFone's internal controls over financial reporting.*" Moreover, VeriFone's market capitalization has been damaged by over $2.6 billion.

5.     The Company's December 3, 2007 announcement was necessary because, during the Relevant Period, defendants had caused VeriFone to issue false and misleading statements regarding the Company's business and prospects. The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)  The Company's in-transit inventory was grossly overvalued due to accounting errors related to allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues. This fraud was revealed by a cost accounting manager in the Company's Sacramento, California office;

(b)  The Company's gross margins were not 45-47% but were closer to 40%;

(c)  The Company was not on track to achieve profitability in 2007, but rather losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd. ("Lipman"), which problems the Company discovered during the due diligence pertaining to the Company's acquisition of Lipman in 2006;

(d)  The Company's gross margin projections were overstated;

(e)  The Company's supply chain management was severely deficient;

(f)  The Company's accounting during the Relevant Period was false and misleading;

(g)  The Individual Defendants failed to adopt and implement adequate internal controls over accounting and financial reporting; and

(h)  That as a result of (a)-(g) above, the Company's estimates of an eleventh consecutive quarter of double digit revenue growth for the first quarter of 2007 and beyond and income per share growth of 20% or more were grossly inflated and the Company's reported assets and inventory were materially overstated as described at ¶¶87-92.

6.  As a result of the false statements, VeriFone's stock price traded at inflated levels during the Relevant Period, increasing to as high as $50 just one month before the end of the Relevant Period. The artificial inflation of the Company's stock allowed the defendants to sell more than $469 million worth of their VeriFone stock at artificially inflated prices.

7.  The Individual Defendants' misconduct has damaged VeriFone and its shareholders. VeriFone has been named as a defendant in class action securities fraud lawsuits. VeriFone is currently incurring millions of dollars in costs due to required internal investigations into the accounting errors, false financial statements, and insider selling. The Company has been forced to hire outside attorneys (Simpson Thacher & Bartlett, LLP) and forensic accountants (Navigant

SHAREHOLDER DERIVATIVE COMPLAINT

1   Consulting, Inc.) to serve as advisors to the internal investigation. The Company's goodwill and

2   reputation have been materially undermined and tarnished.

3        8.     The Individual Defendants' wrongdoing has also significantly damaged VeriFone in

4   that it has caused VeriFone to default on its credit agreements. As a result, the Company has been

5   damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange

6   for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable

7   to its term loans and revolving credit agreements. VeriFone and VeriFone Intermediate Holdings,

8   Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.

9   VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements

10   for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October

11   31, 2007, and the three-month period ended January 31, 2008. As a result, VeriFone was forced to

12   enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders

13   on January 25, 2008. Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of

14   0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay

15   the lenders an increased rate of interest on the term loan – an additional 0.25%; and (3) pay all the

16   legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the

17   Administrative Agent of the lenders) relating to the First Amendment.

18                          **JURISDICTION AND VENUE**

19        9.     Jurisdiction is conferred by 28 U.S.C. §1332. There is complete diversity among the

20   parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and

21   costs.

22       10.     Venue is proper in this District pursuant to 28 U.S.C. §1391. Many of the acts

23   complained of herein occurred in this district and VeriFone's principal executive offices are located

24   at 2099 Gateway Place, Suite 600, San Jose, CA 95110, where the day-to-day operations of the

25   Company are directed and managed.

26                               **THE PARTIES**

27       11.     Plaintiff Mary Lemmond is a current shareholder of VeriFone and was a shareholder

28   of VeriFone at the time of the transaction complained of herein. Plaintiff Lemmond is a citizen of

North Carolina.  Plaintiff Wandell Everett is a current shareholder of VeriFone and was a shareholder of VeriFone at the time of the transaction complained of herein.  Plaintiff Everett is a citizen of Georgia.

12.    Defendant VeriFone Holdings, Inc. is a corporation which designs, markets, and services transaction automation systems that enable secure electronic payments among consumers, merchants, and financial institutions.  The Company's stock is traded on the New York Stock Exchange under the ticker "PAY."  VeriFone is incorporated in Delaware and has its principal place of business in California.  VeriFone is a citizen of both Delaware and California.

13.    Defendant Douglas G. Bergeron ("Bergeron") is VeriFone's Chairman and Chief Executive Officer and has been since July 2001.  Because of Bergeron's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of VeriFone including its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors ("Board") meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Bergeron participated in the issuance of improper statements, including the preparation of the improper press releases and other statements and approval of other statements made to the press, securities analysts and VeriFone shareholders.  Defendant Bergeron received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

During the Relevant Period, Bergeron sold 2,254,834 shares of VeriFone stock for proceeds of $78,699,430.  Mr. Bergeron is a citizen of California.

14.    Defendant Barry Zwarenstein ("Zwarenstein") is VeriFone's Chief Financial Officer and has been since June 2004.  Zwarenstein is also VeriFone's Executive Vice President and has been since November 2006.  Zwarenstein was VeriFone's Senior Vice President from June 2004 to November 2006.  Because of Zwarenstein's positions, he knew, consciously disregarded, was

1  reckless and grossly negligent in not knowing or should have known the adverse, non-public

2  information about the business of VeriFone including its finances, markets and present and future

3  business prospects, via access to internal corporate documents, conversations and connections with

4  other corporate officers and employees, attendance at management meetings, as well as reports and

5  other information provided to him in connection therewith. During the Relevant Period, Zwarenstein

6  participated in the issuance of improper statements, including the preparation of the improper press

7  releases and other statements and approval of other statements made to the press, securities analysts

8  and VeriFone shareholders. Defendant Zwarenstein received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $319,167 | $250,000 | $1,388,600 | 80,000 | $5,087 |

12  During the relevant period, Zwarenstein sold 186,792 shares of VeriFone stock for proceeds of

13  $7,075,260. Zwarenstein is a citizen of California.

14      15.    Defendant Jesse Adams ("Adams") is VeriFone's Vice Chairman and has been since

15  November 2006. Adams was also VeriFone's Executive Vice President, North American Sales from

16  July 2001 to October 2006. Because of Adams' positions, he knew, consciously disregarded, was

17  reckless and grossly negligent in not knowing or should have known the adverse, non-public

18  information about the business of VeriFone including its finances, markets and present and future

19  business prospects, via access to internal corporate documents, conversations and connections with

20  other corporate officers and employees, attendance at management meetings, as well as reports and

21  other information provided to him in connection therewith. During the Relevant Period, Adams

22  participated in the issuance of improper statements, including the preparation of the improper press

23  releases and other statements and approval of other statements made to the press, securities analysts

24  and VeriFone shareholders. Defendant Adams received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $299,167 | $125,000 | $288,600 | 40,000 | $11,687 |

1  During the Relevant Period, Adams sold 209,399 shares of VeriFone stock for proceeds of

2  $7,502,095. Adams is a citizen of California.

3        16.    Defendant Isaac Angel ("Angel") is VeriFone's Executive Vice President, Global

4  Operations and has been since VeriFone acquired Lipman Electronic Engineering, Inc. in November

5  2006. Angel was CEO of Lipman. Because of Angel's positions with Lipman and then with

6  VeriFone, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or

7  should have known the adverse, non-public information about the business of VeriFone including its

8  finances, markets and present and future business prospects, via access to internal corporate

9  documents, conversations and connections with other corporate officers and employees, attendance

10  at management meetings, as well as reports and other information provided to him in connection

11  therewith. Because he was CEO of Lipman prior to Lipman's acquisition by VeriFone, Lipman had

12  actual knowledge of the issues regarding VeriFone's acquisition of Lipman and regarding

13  VeriFone's inflated inventories during the Relevant Period. During the Relevant Period, Angel

14  participated in the issuance of improper statements, including the preparation of the improper press

15  releases and other statements and approval of other statements made to the press, securities analysts

16  and VeriFone shareholders. During the Relevant Period, Angel sold 150,000 shares of VeriFone

17  stock for proceeds of $5,805,400. Angel is a citizen of California.

18        17.    Defendant Elmore Waller ("Waller") is VeriFone's Executive Vice President,

19  Integrated Solution and has been since December 2004. From 1986 to November 2004, Waller has

20  served in a number of leadership positions including Senior Vice President and General Manager of

21  the Worldwide Petro Division. Because of Waller's positions, he knew, consciously disregarded,

22  was reckless and grossly negligent in not knowing or should have known the adverse, non-public

23  information about the business of VeriFone including its finances, markets and present and future

24  business prospects, via access to internal corporate documents, conversations and connections with

25  other corporate officers and employees, attendance at management meetings, as well as reports and

26  other information provided to him in connection therewith. During the Relevant Period, Waller

27  participated in the issuance of improper statements, including the preparation of the improper press

28  releases and other statements and approval of other statements made to the press, securities analysts

1    and VeriFone shareholders. During the Relevant Period, Waller sold 129,800 shares of VeriFone
2    stock for proceeds of $4,909,000. Waller is a citizen of California.

3        18.    Defendant Collin E. Roche ("Roche") is a VeriFone director and has been since July
4    2002. Mr. Roche is a principal of GTCR Golder Rauner, LLC, which owned more than 10% of
5    VeriFone's stock during the Relevant Period. Roche was also, at all relevant times, a member of
6    VeriFone's Compensation Committee. Because of Roche's positions, he knew, consciously
7    disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,
8    non-public information about the business of VeriFone including its finances, markets and present
9    and future business prospects, via access to internal corporate documents, conversations and
10   connections with other corporate officers and employees, attendance at management meetings, as
11   well as reports and other information provided to him in connection therewith. During the Relevant
12   Period, Roche, GTCR Capital Partners, GTCR Co-Invest and CTCR Fund VII caused CTCR Golder
13   Rauner, LLC and its partners to sell 9,800,000 shares of VeriFone stock for proceeds of
14   $358,550,281. Roche is a citizen of Illinois.

15       19.    Defendant James C. Castle ("Castle") is a VeriFone director and has been since
16   January 2005. Castle was also, at all relevant times, a member of VeriFone's Audit Committee.
17   Because of Castle's positions, he knew, consciously disregarded, was reckless and grossly negligent
18   in not knowing or should have known the adverse, non-public information about the business of
19   VeriFone including its finances, markets and present and future business prospects, via access to
20   internal corporate documents, conversations and connections with other corporate officers and
21   employees, attendance at management meetings, as well as reports and other information provided to
22   him in connection therewith. During the Relevant Period, Castle participated in the issuance of
23   improper statements, including the preparation of the improper press releases and other statements
24   and approval of other statements made to the press, securities analysts and VeriFone shareholders.
25   During the Relevant Period, Castle sold 5,000 shares of VeriFone stock for proceeds of $194,300.
26   Castle is a citizen of California.

27       20.    Defendant Leslie G. Denend ("Denend") is a VeriFone director and has been since
28   January 2005. Denend was also, at all relevant times, a member of VeriFone's Audit Committee.

1   Because of Denend's positions, he knew, consciously disregarded, was reckless and grossly

2   negligent in not knowing or should have known the adverse, non-public information about the

3   business of VeriFone including its finances, markets and present and future business prospects, via

4   access to internal corporate documents, conversations and connections with other corporate officers

5   and employees, attendance at management meetings, as well as reports and other information

6   provided to him in connection therewith.  During the Relevant Period, Denend participated in the

7   issuance of improper statements, including the preparation of the improper press releases and other

8   statements and approval of other statements made to the press, securities analysts and VeriFone

9   shareholders.  Mr. Denend is a citizen of California.

10      21.    Defendant Alex W. Hart ("Hart") is a VeriFone director and has been since July

11  2006.  Because of Hart's positions, he knew, consciously disregarded, was reckless and grossly

12  negligent in not knowing or should have known the adverse, non-public information about the

13  business of VeriFone including its finances, markets and present and future business prospects, via

14  access to internal corporate documents, conversations and connections with other corporate officers

15  and employees, attendance at management meetings, as well as reports and other information

16  provided to him in connection therewith.  During the Relevant Period, Hart participated in the

17  issuance of improper statements, including the preparation of the improper press releases and other

18  statements and approval of other statements made to the press, securities analysts and VeriFone

19  shareholders.  Mr. Hart is a citizen of Pennsylvania.

20      22.    Defendant Robert B. Henske ("Henske") is a VeriFone director and has been since

21  January 2005.  Henske was also, at all relevant times, Chairman of VeriFone's Audit Committee and

22  a member of the Compensation Committee.  Because of Henske's positions, he knew, consciously

23  disregarded, was reckless and grossly negligent in not knowing or should have known the adverse,

24  non-public information about the business of VeriFone including its finances, markets and present

25  and future business prospects, via access to internal corporate documents, conversations and

26  connections with other corporate officers and employees, attendance at management meetings, as

27  well as reports and other information provided to him in connection therewith. During the Relevant

28  Period, Henske participated in the issuance of improper statements, including the preparation of the

1 │ improper press releases and other statements and approval of other statements made to the press,

2 │ securities analysts and VeriFone shareholders. Mr. Henske is a citizen of California.

3 │      23.    Defendant Charles R. Rinehart ("Rinehart") is a VeriFone director and has been since

4 │ May 2006. Rinehart was also, at all relevant times, a member of VeriFone's Audit Committee.

5 │ Because of Rinehart's positions, he knew, consciously disregarded, was reckless and grossly

6 │ negligent in not knowing or should have known the adverse, non-public information about the

7 │ business of VeriFone including its finances, markets and present and future business prospects, via

8 │ access to internal corporate documents, conversations and connections with other corporate officers

9 │ and employees, attendance at management meetings, as well as reports and other information

10 │ provided to him in connection therewith. During the Relevant Period, Rinehart participated in the

11 │ issuance of improper statements, including the preparation of the improper press releases and other

12 │ statements and approval of other statements made to the press, securities analysts and VeriFone

13 │ shareholders. Mr. Rinehart is a citizen of California.

14 │      24.    Defendant Eitan Raff ("Raff") is a VeriFone director and has been since October

15 │ 2007. Because of Raff's positions, he knew, consciously disregarded, was reckless and grossly

16 │ negligent in not knowing or should have known the adverse, non-public information about the

17 │ business of VeriFone including its finances, markets and present and future business prospects, via

18 │ access to internal corporate documents, conversations and connections with other corporate officers

19 │ and employees, attendance at management meetings, as well as reports and other information

20 │ provided to him in connection therewith. During the Relevant Period, Raff participated in the

21 │ issuance of improper statements, including the preparation of the improper press releases and other

22 │ statements and approval of other statements made to the press, securities analysts and VeriFone

23 │ shareholders. Mr. Raff is a citizen of Israel.

24 │      25.    Defendant William G. Atkinson ("Atkinson") was VeriFone's Executive Vice

25 │ President, Payment Systems from November 2006 to July 2007. Atkinson was also VeriFone's

26 │ Executive Vice President of global Marketing and Business Development from August 2002 to

27 │ October 2006 and Vice President, North American Financial Channels from August 2001 to April

28 │ 2002. Because of Atkinson's positions, he knew, consciously disregarded, was reckless and grossly

1   negligent in not knowing or should have known the adverse, non-public information about the

2   business of VeriFone including its finances, markets and present and future business prospects, via

3   access to internal corporate documents, conversations and connections with other corporate officers

4   and employees, attendance at management meetings, as well as reports and other information

5   provided to him in connection therewith.  During the Relevant Period, Atkinson participated in the

6   issuance of improper statements, including the preparation of the improper press releases and other

7   statements and approval of other statements made to the press, securities analysts and VeriFone

8   shareholders.  Defendant Atkinson received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $298,958 | $224,664 | $1,388,600 | 40,000 | $9,523 |

12   During the Relevant Period, Atkinson sold 172,118 shares of VeriFone stock for proceeds of

13   $6,404,758.  Mr. Atkinson is a citizen of California.

14       26.    Defendant Craig A. Bondy ("Bondy") was a VeriFone director from July 2002 to

15   September 2007.  Mr. Bondy is a principal of GTCR Golden Rauner, LLC, which owned more than

16   10% of VeriFone's stock during the Relevant Period.  Because of Bondy's positions, he knew,

17   consciously disregarded, was reckless and grossly negligent in not knowing or should have known

18   the adverse, non-public information about the business of VeriFone including its finances, markets

19   and present and future business prospects, via access to internal corporate documents, conversations

20   and connections with other corporate officers and employees, attendance at management meetings,

21   as well as reports and other information provided to him in connection therewith.  During the

22   Relevant Period, Bondy participated in the issuance of improper statements, including the

23   preparation of the improper press releases and other statements and approval of other statements

24   made to the press, securities analysts and VeriFone shareholders.  Bondy, GTCR Capital Partners,

25   GTCR Co-Invest and CTCR Fund VII caused CTCR Golder Rauner, LLC and its partners to sell

26   9,800,000 shares of VeriFone stock for proceed of $358,550,281.  Mr. Bondy is a citizen of Illinois.

27       27.    Defendant DTCR Golder Rauner, LLC is an Illinois limited liability company and has

28   its principal place of business at 6100 Sears Tower, Chicago, Illinois 60606.  GTCR is a private

1    equity firm. Throughout the Relevant Period, GTCR was the single largest VeriFone shareholder

2    and had two designees on VeriFone's board of directors -- defendants Bondy and Roche. Because of

3    Bondy and Roche's positions on the Board, GTCR knew the adverse non-public information about

4    the business of VeriFone. During the Relevant Period, GTCR and its affiliates, of which Bondy and

5    Roche were principals, sold 9,800,000 shares of VeriFone stock for proceeds of $358,550,281.

6    GTCR is a citizen of Illinois.

7        28.    The defendants identified in ¶¶13, 18-24, and 26 are referred to herein as the

8    "Director Defendants." The defendants identified in ¶¶13-17 and 25 are referred to herein as the

9    "Officer Defendants." The defendants identified in ¶¶13-19 and 25-27 are referred to herein as the

10   "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the

11   Insider Selling Defendants are referred to herein as the "Individual Defendants."

12       29.    The true names and capacities of defendants sued herein under California Code of

13   Civil Procedure §474 as Does 1 through 25, inclusive, are presently not known to Plaintiffs, who

14   therefore sues these defendants by such fictitious names. Plaintiffs will seek to amend this

15   Complaint and include these Doe defendants' true names and capacities when they are ascertained.

16   Each of the fictitiously named defendants is responsible in some manner for the conduct alleged

17   herein and for the injuries suffered by the company as a result of defendants' wanton and illegal

18   conduct.

19                      **IMPROPER PERSONAL FINANCIAL BENEFITS**

20       30.    The Individual Defendants and GTCR had knowledge of VeriFone's problems and

21   were motivated to conceal such problems. Zwarenstein, as CFO, was responsible for financial

22   reporting and communications with the market. Many of the internal reports showing VeriFone's

23   forecasted and actual growth were prepared by the finance department under Zwarenstein's

24   direction. During the Relevant Period, Zwarenstein sold 186,792 shares of VeriFone common stock

25   at artificially inflated prices for proceeds of over $7 million. Prior to the Relevant Period,

26   Zwarenstein sold an average of 4,000 shares per month from December until the beginning of the

27   class period. The sale of nearly 187,000 shares over the course of the Relevant Period, a fifteen

28   month period, is an average of 12,452 shares a month, or a 211% increase in sales of Verifone stock.

31.    Defendant Bergeron, as CEO and Chairman, was responsible for the financial results and press releases issued by the Company and/or projections issued by the Company. Bergeron sold 2,254,834 shares of VeriFone stock during the Relevant Period for proceeds of nearly $79 million.

32.    Defendant Atkinson, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, Atkinson sold over 172,000 shares of VeriFone common stock at artificially inflated prices for proceeds of over $6.4 million. In the fifteen months preceding the Relevant Period, Atkinson sold roughly 90,600 shares of Verifone stock. His sale activity in the Relevant Period represents an increase of 90% from his level of sales prior to the Relevant Period.

33.    Defendant Adams, as an Executive Vice President and Vice Chairman, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, Adams sold nearly 210,000 shares of VeriFone common stock at artificially inflated prices for proceeds of over $7.5 million. In the fifteen months preceding the Relevant Period, Adams sold roughly 161,000 shares of Verifone stock. Her sale activity in the Relevant Period represents an increase of 30% from her level of sales prior to the Relevant Period.

34.    Defendant Waller, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. During the Relevant Period, a fifteen month period, Waller sold nearly 130,000 shares in contrast to the under 60,000 shares he sold in the fifteen months preceding the Relevant Period. His sale activity in the Relevant Period represents an increase of 117% from his level of sales prior to the Relevant Period.

35.    Defendant Angel, as an Executive Vice President of Verifone, had knowledge of material, non-public information with regard to the financial outlook of the Company. Angel sold 150,000 shares in the Relevant Period for proceeds of over $5.8 million.

36.    Defendant Castle, as a Director and member of the Verifone Audit Committee, had knowledge of material, non-public information with regard to the financial outlook of the Company. Castle sold 5,000 shares of VeriFone stock during the Relevant Period for proceeds of $194,300. Castle used his positions at the company to benefit financially while on possession of material, non-public information.

37.    The Defendants' illegal insider selling was as follows:

| INSIDER/total | DATE (Mo/Day/Yr) | SHARES | PRICE (in $) | PROCEEDS (in $) |
|---|---|---|---|---|
| **BERGERON** | 11-26-07 | 38,000 | 44.70-46.43 | 1,631,000 |
| | 11-19-07 | 14,405 | 44.70-44.93 | 645,000 |
| | 11-14-07 | 130,792 | 44.70-45.95 | 5,912,000 |
| | 10-10-07 | 200,000 | 45.13-46.56 | 9,137,000 |
| | 09-24-07 | 893 | 38.64 | 34,505 |
| | 09-10-07 | 200,000 | 38.73-39.39 | 3,218,000 |
| | 08-10-07 | 83,700 | 39.05-39.15 | 3,273,000 |
| | 07-12-07 | 200,000 | 36.31-37.00 | 7,325,000 |
| | 06-22-07 | 894 | 36.36 | 32,505 |
| | 06-12-07 | 150,000 | 32.43-33.10 | 4,916,000 |
| | 05-14-07 | 88,100 | 37.78-37.99 | 3,338,000 |
| | 05-10-07 | 97,435 | 37.78-38.34 | 3,702,000 |
| | 04-11-07 | 24,000 | 37.50-37.80 | 904,000 |
| | 03-22-07 | 3,575 | 37.60 | 134,420 |
| | 03-15-07 | 200,000 | 35.83-36.27 | 7,191,000 |
| | 01-10-07 | 200,000 | 35.30-35.55 | 7,085,000 |
| | 12-13-06 | 100,040 | 36.39-37.21 | 3,665,000 |
| | 12-11-06 | 99,900 | 35.55-36.50 | 3,588,000 |
| | 12-04-06 | 82,000 | 33.99-34.57 | 2,807,000 |
| | 12-01-06 | 68,000 | 33.26-33.63 | 2,270,000 |
| | 11-01-06 | 125,000 | 29.29-30.30 | 3,731,000 |
| | 10-02-06 | 28,300 | 28.05-28.45 | 797,000 |
| | 09-05-06 | 119,800 | 27.97-28.76 | 3,363,000 |
| **Total** | | **2,254,834** | | **$78,699,430** |
| **ZWARENSTEIN** | 11-13-07 | 17,878 | 43.53-44.37 | 799,000 |
| | 10-09-07 | 18,000 | 43.45-45.73 | 805,501 |
| | 09-24-07 | 222 | 38.64 | 8,578 |
| | 09-12-07 | 3574 | 39.85 | 142,423 |
| | 09-11-07 | 18,000 | 39.00-39.99 | 714,000 |
| | 08-14-07 | 18,000 | 36.35-37.52 | 663,000 |
| | 07-10-07 | 18,000 | 36.07-36.76 | 655,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-12-07 | 18,000 | 32.50-33.00 | 590,000 |
| | 05-08-07 | 18,000 | 37.14-37.88 | 672,000 |
| | 04-10-07 | 18,000 | 37.48-38.04 | 682,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-15-07 | 18,000 | 35.75-36.22 | 647,000 |
| | 01-09-07 | 4,000 | 35.21-35.58 | 142,000 |
| | 12-12-06 | 4,000 | 36.86-37.57 | 149,000 |
| | 11-30-06 | 4,000 | 32.82-33.75 | 133,000 |
| | 10-31-06 | 4,000 | 29.00-29.22 | 116,000 |
| | 09-29-06 | 4,000 | 28.55-29.00 | 115,000 |
| **Total** | | **186,792** | | **$7,075,260** |
| **BONDY;** | 12-19-06 | 2,773,042 | | 99,219,442 |
| **ROCHE;** | 12-19-06 | 201,571 | | 7,212,210 |
| **GTCR** | 12-19-06 | 25,837 | | 910,631 |
| **ENTITIES** | 06-25-07 | 3,235,216 | | 114,429,589 |

SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 06-25-07 | 235,165 | | 8,317,786 |
| | 06-25-07 | 29,619 | | 1,047,624 |
| | 09-13-07 | 3,050,346 | | 117,773,859 |
| | 09-13-07 | 221,728 | | 8,560,918 |
| | 09-13-07 | 27,926 | | 1,078,222 |
| **GTCR TOTAL** | | **9,800,000** | . | **$358,550,281** |
| **ATKINSON** | 09-26-07 | 35,000 | 42.65-43.73 | 1,508,000 |
| | 07-10-07 | 10,000 | 36.07-36.75 | 364,000 |
| | 07-02-07 | 8,000 | 35.11-35.48 | 283,000 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-11-07 | 10,000 | 32.44-33.00 | 327,000 |
| | 06-01-07 | 8,000 | 34.41-34.93 | 277,000 |
| | 05-10-07 | 10,000 | 37.51-38.30 | 379,000 |
| | 05-01-07 | 8,000 | 35.50-35.97 | 287,000 |
| | 04-10-07 | 10,000 | 37.48-38.04 | 379,000 |
| | 04-02-07 | 8,000 | 36.18-37.76 | 292,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-12-07 | 10,000 | 36.38-36.83 | 366,000 |
| | 03-01-07 | 8,000 | 37.23-38.79 | 306,000 |
| | 02-01-07 | 8,000 | 39.96-40.44 | 322,000 |
| | 01-22-07 | 18,000 | 37.47-38.08 | 680,000 |
| | 12-01-06 | 5,000 | 33.12-33.60 | 166,000 |
| | 11-01-06 | 5,000 | 29.39-30.17 | 149,000 |
| | 10-02-06 | 5,000 | 27.63-28.52 | 140,000 |
| | 09-01-06 | 5,000 | 27.25-28.11 | 138,000 |
| **Total** | | **172,118** | | **$6,404,758** |
| **ADAMS** | 09-24-07 | 222 | 38.64 | 8,578 |
| | 08-10-07 | 20,000 | 38.52-39.10 | 777,000 |
| | 08-01-07 | 61,109 | 35.05-36.58 | 2,186,647 |
| | 07-02-07 | 1,250 | 35.29 | 44,112 |
| | 06-22-07 | 224 | 36.36 | 8,144 |
| | 06-01-07 | 11,354 | 34.41-34.93 | 393,000 |
| | 05-01-07 | 21,167 | 35.50-35.97 | 758,000 |
| | 04-02-07 | 14,604 | 36.18-36.85 | 531,000 |
| | 03-22-07 | 894 | 37.60 | 33,614 |
| | 03-01-07 | 13,354 | 37.23-38.79 | 512,000 |
| | 02-01-07 | 21,166 | 39.96-40.44 | 851,000 |
| | 01-03-07 | 15,524 | 35.11-36.13 | 553,000 |
| | 12-1-06 | 4,945 | 33.12-33.60 | 164,000 |
| | 11-01-06 | 7,793 | 29.39-30.17 | 237,000 |
| | 10-02-06 | 7,793 | 27.63-28.52 | 224,000 |
| | 09-01-06 | 8,000 | 27.25-28.11 | 221,000 |
| **Total** | | **209,399** | | **$7,502,095** |
| **WALLER** | 11-26-07 | 9,800 | 44.39-46.41 | 441,000 |
| | 10-26-07 | 10,000 | 46.25-47.24 | 469,000 |
| | 09-25-07 | 10,000 | 40.00 | 400,000 |
| | 08-10-07 | 20,000 | 38.52-39.12 | 776,000 |
| | 07-09-07 | 20,000 | 36.35-36.94 | 732,000 |
| | 06-13-07 | 20,000 | 35.00 | 700,000 |
| | 02-01-07 | 10,000 | 39.96-40.44 | 402,000 |

SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 01-03-07 | 10,000 | 35.58-36.10 | 358,000 |
| | 12-01-06 | 10,000 | 33.12-33.60 | 333,000 |
| | 11-01-06 | 10,000 | 29.39-30.17 | 298,000 |
| **Total** | | **129,800** | | **$4,909,000** |
| **ANGEL** | 11-13-07 | 15,000 | 43.60-44.12 | 654,000 |
| | 10-09-07 | 15,000 | 43.97-44.13 | 661,000 |
| | 09-11-07 | 15,000 | 39.62-39.77 | 595,000 |
| | 08-14-07 | 15,000 | 36.68-36.84 | 551,000 |
| | 07-10-07 | 15,000 | 36.38-36.46 | 546,000 |
| | 06-13-07 | 15,000 | 34.36 | 515,400 |
| | 05-08-07 | 15,000 | 37.56-37.58 | 564,000 |
| | 04-10-07 | 15,000 | 37.85-37.87 | 568,000 |
| | 03-13-07 | 15,000 | 35.93-36.24 | 541,000 |
| | 02-08-07 | 15,000 | 40.60-40.75 | 610,000 |
| **Total** | | **150,000** | | **$5,805,400** |
| **CASTLE** | 09-14-07 | 4500 | 39.20-39.22 | 176,000 |
| | 12-13-06 | 500 | 36.60 | 18,300 |
| **Total** | | **5000** | | **$194,300** |
| **COMBINED TOTAL** | | **12,907,943** | | **$469,140,524** |

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants and GTCR have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants and GTCR further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants and GTCR collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly portraying its business prospects in order to allow defendants to artificially inflate the price of the Company's shares and sell over $469 million of VeriFone stock; (ii) maintain the Individual Defendants' executive and directorial positions at VeriFone and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of VeriFone, regarding the Individual Defendants' management of VeriFone's operations, the Company's financial health and stability,

1    and future business prospects, specifically related to the Company's financials that had been

2    misrepresented by defendants throughout the Relevant Period. In furtherance of this plan,

3    conspiracy and course of conduct, the Individual Defendants and GTCR collectively and

4    individually took the actions set forth herein.

5        40.    The Individual Defendants and GTCR engaged in a conspiracy, common enterprise

6    and/or common course of conduct commencing by at least September 1, 2006 and continuing

7    thereafter. During this time, the Individual Defendants caused the Company to conceal the true

8    fact that VeriFone was misrepresenting its business prospects and in-transit inventory. In addition,

9    defendants also made other specific, improper statements about VeriFone's financial performance

10   and future business prospects, as alleged herein.

11       41.    The purpose and effect of the conspiracy, common enterprise, and/or common

12   course of conduct was, among other things, to disguise the Individual Defendants' violations of

13   law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal

14   adverse information concerning the Company's operations, financial condition and future business

15   prospects; and to artificially inflate the price of VeriFone common stock so defendants could: (i)

16   engage in insider selling of VeriFone securities; and (ii) protect and enhance their executive and

17   directorial positions and the substantial compensation and prestige they obtained as a result thereof.

18       42.    The Individual Defendants and GTCR accomplished their conspiracy, common

19   enterprise and/or common course of conduct by causing the Company to purposefully, recklessly

20   or negligently misrepresent its business prospects and release improper statements. Because the

21   actions described herein occurred under the authority of the Board, each of the Individual

22   Defendants and GTCR was a direct, necessary and substantial participant in the conspiracy,

23   common enterprise and/or common course of conduct complained of herein.

24       43.    Each of the Individual Defendants and GTCR aided and abetted and rendered

25   substantial assistance in the wrongs complained of herein. In taking such actions to substantially

26   assist the commission of the wrongdoing complained of herein, each Individual Defendant and

27   GTCR acted with knowledge of the primary wrongdoing, substantially assisted the

28

1    accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance

2    of the wrongdoing.

3    <u>**DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

4         44.     By reason of their positions as officers, directors and/or fiduciaries of VeriFone, and

5    because of their ability to control the business and corporate affairs of VeriFone, the Individual

6    Defendants owed VeriFone and its shareholders fiduciary obligations of trust, loyalty, good faith

7    and due care, and were and are required to use their utmost ability to control and manage VeriFone

8    in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act

9    in furtherance of the best interests of VeriFone and its shareholders so as to benefit all shareholders

10    equally and not in furtherance of their personal interest or benefit.

11         45.     Each director and officer of the Company owes to VeriFone and its shareholders the

12    fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

13    Company and in the use and preservation of its property and assets, and the highest obligations of

14    fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual

15    Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

16    Company's revenue, margins, operations, performance, management, projections and forecasts so

17    that the market price of the Company's stock would be based on truthful and accurate information.

18         46.     The Individual Defendants, because of their positions of control and authority as

19    directors and/or officers of VeriFone, were able to and did, directly and/or indirectly, exercise

20    control over the wrongful acts complained of herein, as well as the contents of the various public

21    statements issued by the Company. Because of their advisory, executive, managerial and

22    directorial positions with VeriFone, each of the Individual Defendants had access to adverse non

23    public information about the financial condition, operations, and improper representations of

24    VeriFone.

25         47.     At all times relevant hereto, each of the Individual Defendants was the agent of each

26    of the other Individual Defendants and of VeriFone, and was at all times acting within the course

27    and scope of such agency.

28

48.    To discharge their duties, the officers and directors of VeriFone were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of VeriFone were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how VeriFone conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

49.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

- 18 -

1  obligations as directors and officers of VeriFone, the absence of good faith on their part, and a

2  reckless disregard for their duties to the Company and its shareholders that the Individual

3  Defendants were aware or should have been aware posed a risk of serious injury to the Company.

4  The conduct of the Individual Defendants who were also officers and/or directors of the Company

5  during the Relevant Period have been ratified by the remaining Individual Defendants who

6  collectively comprised all of VeriFone's Board during the Relevant Period.

7      50.    Furthermore, defendants Henske, Castle, Denend and Rinehart, as members of the

8  Audit Committee, had a special duty to know and understand this material information as set out in

9  the Audit Committee's charter which provides that the committee is responsible for reviewing and

10  discussing: (i) the Company's earnings press releases, as well as financial information and earnings

11  guidance provided by the Company to analysts and rating agencies; and (ii) the Company's internal

12  controls.

13      51.    Specifically, the Audit Committee's purpose is to assist the Board of Directors'

14  oversight of:

15      (i) the integrity of the Company's financial statements, (ii) the accounting and
   financial reporting processes of the Company and the audits of the financial
16   statements of the Company, (iii) the Company's compliance with legal and regulatory
   requirements, (iii) the independent auditors' qualifications and independence, and (iv)
17   the performance of the Company's internal audit function and independent auditors.

18      52.    The Audit Committee also has the following responsibilities: (i) supervise the

19  independent audit, (ii) oversee internal audit, internal controls and risk management, (iii) oversee

20  financial reporting, (iv) oversee legal and ethical compliance, and (v) prepare minutes and reports.

21      53.    The Individual Defendants breached their duties of loyalty and good faith by allowing

22  defendants to cause, or by themselves causing, the Company to misrepresent its financial results and

23  prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking

24  such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct

25  during the Relevant Period, the Company is now the subject of a class action lawsuit that alleges

26  violations of federal securities laws.  As a result, VeriFone has expended, and will continue to

27  expend, significant sums of money.

28

54.    Moreover, these actions have irreparably damaged VeriFone's corporate image and goodwill.  VeriFone's Board has misled the investing public, such that VeriFone's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## BACKGROUND TO THE RELEVANT PERIOD

55.    Prior to the beginning of the Relevant Period, VeriFone's stock price had dropped by over 20% (from the $30s to the low $20s) due to the market's concern that VeriFone's gross margins were slowing and would be flat or actually decrease in 2007.  In an effort to dispel these concerns, the Individual Defendants embarked on a scheme to falsely report gross margins in the mid to high 40%, when in fact VeriFone's gross margins were stuck at around 40% and were actually at risk of decreasing.

56.    Defendants' scheme of portraying VeriFone as experiencing increased gross margins depended in large part on the pending Lipman acquisition, and VeriFone's ability to integrate that acquisition with minimal costs and with the acquisition being accretive to both earnings and margins. Defendants falsely told the market that this would occur.  However, defendants discovered negative information about Lipman during the due diligence that demonstrated that increased expenses and reduced margins would occur.

57.    VeriFone and Lipman Electronic Engineering, Ltd. ("Lipman") had been familiar with each other's businesses for several years.  There were intermittent informal contacts between representatives and VeriFone and Lipman at various times prior to VeriFone's initial public offering in April 2005.

58.    On May 10, 2005, Douglas Bergeron had contacted defendant Isaac Angel, who at the time was the CEO of Lipman, and suggested a meeting to discuss whether a future business combination or strategic transaction would be feasible.

59.    To facilitate discussions, VeriFone and Lipman entered into a confidentiality agreement on June 1, 2005.  On June 7, 2005, Mr. Angel and Mike Lilo, the CFO of Lipman, met with Mr. Bergeron and Mr. Swarenstein in New York to discuss the possibility of a business combination.

SHAREHOLDER DERIVATIVE COMPLAINT

60.    On September 28, 2005, Lipman had announced that it was lowering its full year 2005 earnings guidance with respect to revenues and net income per share as a result of substantially weaker than expected performance at its Dione subsidiary. Lipman's stock price decreased by approximately $6 per share on the news.

61.    On December 4, 2005, Mr. Bergeron contacted Mr. Angel to inquire whether Lipman was interested in renewing discussions with VeriFone. On December 7, 2005, Mssrs. Angel, Lilo, Bergeron and Swarenstein participated in a conference call and agreed to renew merger discussions. During the next several months, into the spring of 2006, Lipman and VeriFone engaged in significant merger discussions which included their legal and financial advisors.

62.    On March 17, 2006, VeriFone's outside legal counsel delivered a formal request for due diligence to outside counsel for Lipman. On March 23, 2006, VeriFone and Lipman signed an exclusivity letter providing for an exclusivity period up to and including April 15, 2006. The parties commenced a due diligence process on March 24, 2006 when Lipman's electronic data room became accessible to representatives of VeriFone. Between March 24, 2006 and April 10, 2006, VeriFone and its financial advisors and legal counsel conducted due diligence on Lipman.

63.    On April 10, 2006, Lipman and VeriFone signed a merger agreement pursuant to which VeriFone acquired Lipman later in 2006, with the acquisition closing on November 1, 2006.

## FALSE AND MISLEADING STATEMENTS

64.    On August 31, 2006, the Company announced record Q3 2006 financial results, sending the Company's shares soaring. The Company announced net revenues for the third quarter of $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period of 2005. The Individual Defendants caused the Company to announce the results in a press release entitled: "VeriFone Reports Third Quarter Fiscal 2006 Results," which stated as follows:

> "Net revenues for the three months ended July 31, 2006, were $147.6 million, an increase of 17% over net revenues of $125.7 million for the comparable period of fiscal 2005. The increase was driven by a 19% increase in net revenues from VeriFone's North America business and a 16% increase in net revenues in VeriFone's International business.
>
> *Gross margins, under generally accepted accounting principles (GAAP), for the three months ended July 31, 2006, were 45.0%, compared to 40.7% for the three months ended July 31, 2005. Gross margins, excluding non-cash amortization of*

*purchased intangibles and stock-based compensation expense, expanded for the seventh consecutive quarter and reached 45.9% compared to 42.0% for the three months ended July 31, 2005.*

Net income for the three months ended July 31, 2006, was $16.8 million, or $0.24 per diluted share, compared to $6.5 million, or $0.10 per diluted share, for the comparable period of fiscal 2005. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended July 31, 2006, was $19.7 million, or $0.28 per diluted share, compared to $13.1 million, or $0.20 per diluted share, for the comparable period of fiscal 2005.

"We are once again extremely pleased with the consistency of our quarterly results, demonstrated by our tenth consecutive quarter with double digit revenue growth and our eighth consecutive quarter of expanded EBITDA as adjusted margins, which reached a record level of 22.6% in the quarter," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "We are expecting to close the acquisition of Lipman Electronic Engineering Ltd. by November 1, 2006, and remain confident that we will receive clearance by the United States Department of Justice very shortly. We remain on track to deliver another year of outstanding results and *we remain confident in our long-term model, which calls for annual revenue growth of 10 to 15% and annual adjusted net income per share growth of 20% or more.*"

"Based on our confidence with our near term and long term outlook, *we are raising our FY06 year end guidance to $1.07 to $1.08 of adjusted net income per share. We are also raising our FY07 guidance to $1.40 to $1.42 of adjusted net income per share, assuming a November 1, 2006, completion of the Lipman acquisition,*" continued Bergeron.

65.    On this news of this increased guidance, the Company's shares soared to $28.47 per share on September 1, 2006.

66.    On September 5, 2006, Bergeron sold 119,800 shares of VeriFone stock at approximately $28 per share.

67.    On September 7, 2006, the Individual Defendants caused the Company to issue the following press release:

VeriFone's Proposed Acquisition of Lipman Receives Department of Justice Clearance

SAN JOSE, CA, and ROSH HAAYIN, Israel - September 07, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) and Lipman Electronic Engineering Ltd. (NASDAQ: LPMA; TASE: LPMA) today announced they have received clearance from the United States Department of Justice (DOJ) to complete VeriFone's pending acquisition of Lipman. Shareholder meetings for each company are scheduled for mid-September and, if each group of shareholders approves the transaction, the parties expect to close on November 1 following the expiration of a 30-day waiting period required by Israeli law after the Lipman shareholders' meeting.

68.    On September 15, 2006, VeriFone issued the following press release:

"San Jose, CA - September 15, 2006 - VeriFone Holdings, Inc. (NYSE: PAY) announced that at a special meeting today its stockholders overwhelmingly voted to approve its acquisition of Lipman Electronic Engineering Ltd. At the VeriFone special meeting more than 99.5 percent of the shares represented were voted in favor of the issuance of VeriFone stock in the transaction, constituting a substantial majority of the outstanding VeriFone shares. The acquisition had previously been approved by the Lipman shareholders in a special meeting held on September 14. "We are very pleased by the strong support for the transaction from both VeriFone and Lipman shareholders," said Douglas G. Bergeron, chairman and chief executive officer of VeriFone. *"This combination will provide VeriFone with the product breadth, global reach and R&D capabilities to drive significant value for shareholders, customers and employers.* We look forward to completing the Lipman acquisition on November 1, 2006, as planned."

69.    On September 29, 2006, Zwarenstein sold 4,000 shares of VeriFone stock at approximately $29 per share.

70.    On December 7, 2006, the Individual Defendants caused VeriFone to announce the following financial results:

VeriFone Reports Fourth Quarter and Fiscal 2006 Results

Fourth-Quarter Revenues Increased 20% to $157 Million

EBITDA, as Adjusted, Margins Increased to 24.2% for the Quarter

Fourth Quarter Net Income, as Adjusted, Increased 50% to $22.3 Million

SAN JOSE, Calif.--(BUSINESS WIRE)--Dec. 7, 2006--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months and fiscal year ended October 31, 2006.

Net revenues for the three months ended October 31, 2006, were $156.6 million, an increase of 20% over net revenues of $130.5 million for the comparable period of 2005. The increase was driven by a 30% increase in net revenues from VeriFone's International business and a 14% increase in net revenues from VeriFone's North America business.

*Gross margins, under generally accepted accounting principles (GAAP), for the three months ended October 31, 2006, were 46.0%, compared to 42.7% for the three months ended October 31, 2005.* Gross margins, excluding non-cash amortization of purchased intangibles and stock-based compensation expense, *expanded for the eighth consecutive quarter and reached 47.1% for the three months ended October 31, 2006, compared to 44.0% for the comparable period of 2005.*

Net income for the three months ended October 31, 2006, was $13.9 million, or $0.20 per diluted share, compared to $12.1 million, or $0.18 per diluted share, for the comparable period of fiscal 2005. GAAP net income was impacted in the quarter by the $4.1 million after-tax write off of debt issuance costs, attributable to the refinancing of outstanding debt in connection with the Lipman acquisition. Net income, as adjusted, which excludes non-cash amortization of purchased intangibles

- 23 -

and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended October 31, 2006, was $22.3 million, or $0.32 per diluted share, compared to $14.9 million, or $0.22 per diluted share, for the comparable period of fiscal 2005.

EBITDA, as adjusted, which excludes non-cash amortization of purchased intangibles and debt issuance costs, as well as non-cash stock-based compensation expense, expanded for the ninth consecutive quarter and reached a record level of $38.0 million, a 44% increase over the $26.5 million recorded in the three months ended October 31, 2005. EBITDA, as adjusted, margins for the three months ended October 31, 2006, reached 24.2%, as compared to the 20.3% recorded in the three months ended October 31, 2005.

Net revenues for the fiscal year ended October 31, 2006, were $581.0 million, an increase of 20% over the $485.4 million recorded for fiscal 2005.

Net income for the fiscal year ended October 31, 2006, was $59.5 million, compared to $33.2 million for fiscal 2005. Net income, as adjusted, for the fiscal year ended October 31, 2006, was $76.4 million, compared to $49.7 million, for fiscal 2005.

EBITDA, as adjusted, for the fiscal year ended October 31, 2006, was $130.4 million, an increase of 51% over the $86.4 million recorded for fiscal 2005. EBITDA, as adjusted, margins for the fiscal year ended October 31, 2006, were 22.4%, compared to 17.8% for the comparable period of 2005.

"VeriFone has completed another outstanding quarter and achieved record revenue and earnings for fiscal year 2006. *This year was highlighted by our transformative acquisition of Lipman* which combined the two strongest financial performers in the industry to create the world leader in payment technology," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"We enter our new financial year poised to capitalize on our numerous competitive advantages and our very wide range of product offerings," continued Bergeron. *"The integration of Lipman into VeriFone has been completed ahead of schedule and we have created a single-branded, unified company with tremendous scale advantages. Already, we are enjoying several supply chain efficiencies and earnings accretion."*

*"As a result, we have increased our internal expectations for fiscal Q1 2007 net earnings per share, as adjusted, to be in the range of $0.33 to $0.34. We remain very confident of our prospects in fiscal 2007."*

71.    On March 1, 2007, the Individual Defendants caused VeriFone to issue the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--March 1, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended January 31, 2007. The Company's first quarter results reflect the November 1, 2006, acquisition of Lipman and, because of the integration of Lipman's products and distribution channels as well as the lack of comparable quarter ends of VeriFone and Lipman, are compared to pre-acquisition results of prior fiscal periods.

SHAREHOLDER DERIVATIVE COMPLAINT

Net revenues, for the three months ended January 31, 2007, were $216.6 million, 61% higher than the net revenues of $134.6 million for the comparable period of 2006. The record revenues were driven by the Lipman acquisition and a strong performance internationally.

*Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, were 47.1%, for the three months ended January 31, 2007, compared to 45.6% for the comparable period of 2006.* GAAP gross margins for the three months ended January 31, 2007, were 37.6%, compared to 44.3% for the three months ended January 31, 2006, as a result of increased amortization of purchased technology assets and the step-up in inventory.

EBITDA, as adjusted, margins for the three months ended January 31, 2007, expanded for the tenth consecutive quarter and reached a record level of 25.7%, compared to the 21.0% recorded in the three months ended January 31, 2006.

GAAP EPS for the three months ended January 31, 2007, was a loss of ($0.01) per diluted share, compared to $0.20 per diluted share, for the comparable period of fiscal 2006, due to acquisition related charges and a higher GAAP tax rate. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense, for the three months ended January 31, 2007, increased 54% to $0.37 per diluted share, compared to $0.24 per diluted share, for the three months ended January 31, 2006.

*"VeriFone has successfully completed its first quarter since our transformative acquisition of Lipman.* I am delighted both with the progress that we have made in integrating Lipman's business into VeriFone and in generating another very strong quarter financially and operationally," said Douglas G. Bergeron, Chairman and Chief Executive Officer.

"VeriFone's newly configured worldwide sales force is serving customers through a fully integrated distribution channel and supply chain. At the same time we have been reducing inventory and generating considerable operating cash flow," continued Bergeron.

*"Based on these results, we are increasing our second quarter internal expectations for net income, as adjusted, per share to be in the range of $0.36 to $0.37. We remain very confident of our prospects for fiscal 2007."*

72.     On March 6, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - March 06, 2007 - VeriFone Holdings, Inc. (NYSE: PAY; TASE: PAY) today announced that it has installed one of the largest and most complex card payment systems in the UK for retail giant Argos. VeriFone's PAYware Merchant system has been rolled out to more than 600 Argos stores in the UK, allowing Argos to process 50 transactions per second – more than 100 million transactions every year.

Argos – part of the Home Retail Group which also owns Homebase – has implemented the PAYware Merchant system nationwide as part of its move to EMV Chip and PIN, enabling secure authorization of payments in seconds and providing sophisticated management and reporting capabilities, including a comprehensive audit trail.

- 25 -

PAYware Merchant is ideal for medium- and large-size retailers who need a secure, reliable, and easy-to-implement credit and debit card authorization and settlement solution that supports EMV Chip and PIN. This fully scalable, bank-certified solution provides rapid payment processing that is tightly integrated with any front-end environment and is proven to increase revenue, reduce costs and improve customer satisfaction.

"We saw the move to Chip and PIN as an opportunity to review our existing EFT system," said Jacqui Glenn, head of Argos IT. "As a business-critical system, we were looking for a card payment solution that offered security, speed and reliability. We chose PAYware because of its proven success with other retailers, and the smooth implementation and fast 'go live' confirmed that we made the right decision."

Nigel Bidmead, managing director for VeriFone EMEA added, "The PAYware Merchant system deserves its excellent reputation as a robust and reliable solution for high-volume environments. We are very pleased to add Argos to the list of major UK retail customers who are gaining tangible business benefits from VeriFone's card payment systems."

PAYware Merchant accepts all major cards and supports the latest fraud prevention initiatives, including EMV and 3D Secure for Internet payments. Designed with industry best practices for data security, it enables retailers to become compliant with the Payment Card Industry Data Security Standard (PCI DSS). All of this guards against fraud and helps protect brand reputation and consumer confidence.

73.    On March 30, 2007, Individual Defendants Bergeron and Zwarenstein caused VeriFone to file a letter with the SEC on EDGAR responding to a February 28, 2007 letter from the SEC raising questions about the significant increase in VeriFone's inventory that had been reported in VeriFone's fiscal year 2006 financial results reported in the Company's Form 10-K for 2006. The SEC's letter had stated: "We note that your inventory increased dramatically during 2006. Please quantify the amount of the increase caused by each factor cited on page 49. In addition, explain to us, in more detail, why the acquisition contributed to this large increase and what impact, if any, that increase may have on the inventory that you acquired from Lipman." In response, VeriFone's letter stated:

"While VeriFone expected that it would have to increase inventories at least to planned levels in early fiscal 2006, as revenues continued to increase during fiscal 2006, VeriFone began to realize that its business required higher than planned inventory levels in order to

1    support future expected levels of revenues. Consequently, during fiscal 2006, VeriFone's

2    inventories increased in each quarter."

3       74.    VeriFone's March 30, 2007 letter to the SEC also falsely blamed its increased

4    inventory levels on "the impact of VeriFone's planned acquisition of Lipman which was announced

5    in the last month of the second quarter, as well as the continuing effect of further revenue increases."

6    The Company also attributed the increased inventories to the fact that "the Company sought to

7    respond to more uncertain demand patterns." The Company also stated: "Finally, in the fourth

8    quarter of fiscal 2006, inventory increased a further $13 million, mainly due to stocking of new

9    product inventory and the Company's decision to accelerate deliveries from certain suppliers in

10   anticipation of a physical inventory count at a large distribution center."

11      75.    The statements in the Company's March 30, 2007 letter to the SEC were false and

12   misleading when made since Bergeron and Zwarenstein attributed false reasons in the letter for the

13   dramatic increase in VeriFone's inventory.

14      76.    On April 18, 2007, VeriFone issued the following press release:

15   San Jose, CA - April 18, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today
     announced that it has secured a key contract with leading transaction switching and
16   electronic payment processing company InterSwitch Nigeria Limited to enable inter-
     bank electronics payments for Nigerian cardholders. VeriFone's GPRS-enabled $V_x$
17   610 payment systems are being rolled out nationwide to InterSwitch's bank and
     merchant customers.

18
     InterSwitch is the leading e-payment solutions provider in Nigeria – Africa's
19   most populous country – and, according to Financial Standard Newspaper, one of
     Nigeria's top 10 recognized brands. Any Nigerian cardholder will now be able to use
20   their Nigeria Debit Cards, CashCards and other payment cards issued on the
     InterSwitch platform at ATMs and point of sale devices deployed by banks other
21   than their own. Currently, InterSwitch has an online real-time integration to 23 out of
     the 25 banks in Nigeria. This infrastructure allows almost all of the country's banks
22   to share ATM and point of sale systems.

23       "We have a high regard for VeriFone and its excellent product offerings,"
     said Mitchell Elegbe, CEO of InterSwitch Nigeria. "VeriFone has earned a strong
24   reputation in West Africa through its commitment to helping develop this growing
     payments sector, and with access to such advanced payment systems it will create the
25   opportunity for us to enhance our strong market presence here."

26       Nigel Bidmead, managing director for VeriFone EMEA, said, "VeriFone's
     advanced GPRS technology payment systems are especially suited to Nigeria's large
27   developing payments markets, where a constant online communication channel
     between the merchant and InterSwitch is the key to fast and secure transactions."

28

- 27 -
SHAREHOLDER DERIVATIVE COMPLAINT

77.    On May 29, 2007, the Individual Defendants caused VeriFone to announce record second quarter 2007 financial results in the following press release:

SAN JOSE, Calif.--(BUSINESS WIRE)--May 29, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended April 30, 2007.

Net revenues, for the three months ended April 30, 2007, were $217.2 million, 53% higher than the net revenues of $142.2 million for the comparable period of 2006. VeriFone's International business increased 97% and VeriFone's North America business increased 19%. The significant increase in sales was driven largely by the acquisition of Lipman, which closed November 1, 2006.

Subsequent to the end of the quarter, management determined that booked orders of approximately $4 million could not be recognized as revenue due to incomplete sales administration requirements in our international operations. These orders were largely sourced from VeriFone's new Israeli and Turkish facilities and all were headed to high growth markets in Asia, Eastern Europe and Africa. The Company is confident that the shortcomings in applying these field processes have now been remedied. All of this revenue has now been fully recognized and is reflected in guidance for the third quarter.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.1%, for the three months ended April 30, 2007, compared to 45.7% for the comparable period of 2006. GAAP gross margins for the three months ended April 30, 2007, were 41.5%, compared to 44.6% for the three months ended April 30, 2006, as a result of increased amortization of purchased technology assets, the step-up in inventory and stock-based compensation.

GAAP operating expenses for the three months ended April 30, 2007, were $72.9 million compared to $37.8 million for the comparable period of 2006. In addition to the effect of the Lipman acquisition and related integration expenses, the Company incurred higher non-cash stock compensation expenses and amortization of purchased intangible assets. Stock based compensation for the three months ended April 30, 2007 was $9.8 million compared to $1.0 million for the comparable period of 2006. This increase was primarily due to the acceleration of the vesting of options of Lipman executives, the increase in the number of option holders following the Lipman acquisition and the grant of performance-based restricted stock units to the Company's Chief Executive Officer. Amortization of purchased intangible assets for the three months ended April 30, 2007 was $6.1 million compared to $1.2 million for the comparable period of 2006, primarily due to the Lipman acquisition.

EBITDA, as adjusted, margins for the three months ended April 30, 2007, expanded for the eleventh consecutive quarter and reached a record level of 26.3%, compared to the 21.6% recorded in the three months ended April 30, 2006.

GAAP EPS for the three months ended April 30, 2007, was $0.06 per diluted share, compared to $0.22 per diluted share, for the comparable period of fiscal 2006, due to acquisition related non-cash charges, higher stock-based compensation expense primarily related to the Lipman acquisition and to a significantly higher GAAP tax rate driven by an increase in the valuation allowance related to Lipman. Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and

Lipman integration costs, for the three months ended April 30, 2007, increased 50% to $0.39 per diluted share, compared to $0.26 per diluted share, for the three months ended April 30, 2006.

"I am pleased to report on another very successful quarter for VeriFone as we once again achieved record profitability," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, our record margins drove our robust EPS growth, and also resulted in strong cash flow," continued Bergeron. "We were especially pleased with our continuing success of our wireless products and were delighted with the resurgence of our North American business which grew sequentially 8 percent from the previous quarter."

"Based on these results and the $4 million of revenue which has been recognized in the third quarter, *we are increasing our third quarter internal expectations for net revenue to $225 - $227 million and increasing our guidance for net income, as adjusted, per share to a range of $0.39 - $0.40. We remain confident of our prospects for the remainder of fiscal 2007.*"

78.     On July 12, 2007, the Individual Defendants caused VeriFone to issue the following press release:

New York, NY - July 12, 2007 - VeriFone Holdings, Inc. (NYSE:PAY) announced today an agreement to be the preferred vendor of integrated payment solutions to the largest licensed leasing association in New York City, the Committee for Taxi Safety with 3,000 member taxis. VeriFone also announced that more than 5,000 New York City taxis are signed or committed to comprehensive multi-year agreements for in-taxi acceptance of credit cards.

Last month, systems implemented by VeriFone's US-based taxi business, VeriFone Transportation Systems, were the first authorized by the NYC Taxi and Limousine Commission (TLC) for the city's more than 13,000 taxis.

Jeff Dumbrell, VeriFone senior vice president, North America, said, "New York City currently has over 13,000 active yellow cabs that have been mandated to provide card payment and passenger information services by the end of the year. We are continuing our sales campaign and expect to make further progress in the months ahead."

Committee for Taxi Safety Agreement Amos Tamam, president and CEO of VeriFone Transportation Systems, said the company is eager to work with member organizations of the Committee for Taxi Safety. "In addition to providing customers with convenient payment choices, member organizations will benefit from improved fleet management and the potential for enhanced revenue through advertising," Tamam said. "They will be able to provide better customer service to New York residents and visitors through up-to-the-minute access to real-time traffic information, news, sports, weather and entertainment."

According to David Pollack, executive director of the Committee for Taxi Safety, "Reliability, previous experience and a wealth of functionality made VeriFone Transportation Systems the logical choice for all members of our organization. We are pleased to begin this new era in technology with a company that has impeccable equipment and software for our drivers, passengers and members."

Beginning October 1, 2007, upon their next scheduled inspection all New York taxis are mandated to have technology-based customer service improvements that will include credit/debit card acceptance and an interactive electronic passenger map and information screen.

Previously, VeriFone was awarded similar services for 100 percent of the Philadelphia taxi fleet, and a significant award in Mexico City, Mexico. Discussions and pilots continue with several other worldwide metropolitan organizations.

The VeriFone-based solution utilizes wireless technology to provide integrated payment in the passenger cab, including a card swipe and contactless payment for credit and debit payment of fares, in an easy-to-use ATM style interface. The riding experience is further enhanced with the Passenger Information Monitor, a 10.4-inch touch-screen monitor that provides exclusive news and content for passengers through an exclusive partnership with market-leading WABC-TV New York.

A smaller model utilizes the VeriFone MX870, which supports secure credit card transactions and PIN-based debit card transactions with contactless payment and electronic signature capture, as well as advertising and content delivery. The smaller option will provide an ideal solution for the integration of potentially smaller hybrid vehicles.

VeriFone is the majority shareholder of VeriFone Transportation Systems, a joint venture between VeriFone Holdings, Inc. and TaxiTronics, the company that services over 8,000 of the taxi meters in the city cab fleet.

79.    On September 6, 2007, the Individual Defendants caused VeriFone to publicly announce its Q3 '07 financial results:

SAN JOSE, Calif.--(BUSINESS WIRE)--Sept. 6, 2007--VeriFone Holdings, Inc. (NYSE: PAY), the global leader in secure electronic payment solutions, today announced financial results for the three months ended July 31, 2007.

Net revenues, for the three months ended July 31, 2007, were $231.9 million, 57% higher than the net revenues of $147.6 million for the comparable period of 2006. Net revenues from VeriFone's International business increased 106% while net revenues from VeriFone's North America business increased 22%. The significant increase in net revenues was driven largely by the acquisition of Lipman Electronic Engineering Ltd., which closed November 1, 2006.

Gross margins, excluding non-cash acquisition related charges and stock-based compensation expense, expanded to a record 48.2%, for the three months ended July 31, 2007, compared to 45.9% for the comparable period of 2006. GAAP gross margins for the three months ended July 31, 2007, declined to 44.0% from 45.0% for the three months ended July 31, 2006, primarily as a result of increased amortization of purchased technology assets.

GAAP operating expenses for the three months ended July 31, 2007 were $65.5 million compared to $38.0 million for the comparable period of 2006. This increase was primarily due to the Lipman acquisition and related integration expenses.

SHAREHOLDER DERIVATIVE COMPLAINT

EBITDA, as adjusted, margins for the three months ended July 31, 2007, expanded for the twelfth consecutive quarter and reached a record level of 27.3%, compared to the 22.6% recorded in the three months ended July 31, 2006.

GAAP EPS for the three months ended July 31, 2007, was $0.16 per diluted share, compared to $0.24 per diluted share, for the comparable period of fiscal 2006. *This decline resulted from acquisition related non-cash charges, higher stock-based compensation expense and a higher GAAP tax rate driven by an increase in the valuation allowance related to the Lipman acquisition.* Net income, as adjusted, which excludes non-cash acquisition related charges and debt issuance costs, as well as non-cash stock-based compensation expense and Lipman integration costs, for the three months ended July 31, 2007, increased 50% to $0.42 per diluted share, compared to $0.28 per diluted share, for the comparable period in 2006.

"I am extremely pleased to report on another outstanding quarter as we once again achieved exceptional financial results," said Douglas G. Bergeron, Chairman and Chief Executive Officer. "During the quarter, we achieved record revenues and record gross and operating margins, all which led to strong EPS growth," continued Bergeron. "Our North American business continued to surge, growing 9% sequentially. Our compelling portfolio of wireless solutions and our strength in emerging markets were also significant factors driving our success this quarter."

*"We are increasing our internal expectations for the fourth quarter and now expect to repeat these record third quarter results. Our guidance for the fourth quarter, therefore, is for net revenue of $231 - $233 million and net income, as adjusted, per share of $0.41 - $0.42. As a result, we are also increasing our full year fiscal year 2007 expectations for net income, as adjusted per share to $1.59 to $1.60 per share. As well, given the out-performance in profitability that we have consistently enjoyed since the closing of the Lipman acquisition last November, we are now taking this opportunity to update our long term financial model. We are reaffirming our revenue growth rate projection in the 10% - 15% range and we are increasing our margin expectations as reflected in the table below."*

Long Term Model

|  | Prior | New |
|---|---|---|
| Gross Margin | 42%-47% | 45%-50% |
| EBITDA Margin | 18% - 24% | 25% - 30% |
| Net Margin | 12% - 17% | 15% - 20% |

80.    On October 11, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - October 11, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) today announced it has added Ruth's Chris Steak House of Austin to the roster of restaurants using its ON THE SPOT payment at the table solution.

Servers at the fine dining restaurant at 107 West Sixth Street will bring their patrons a small, handheld VeriFone $V_x$ 670 payment system that allows them to swipe their own credit or debit cards at their table. ON THE SPOT speeds service to Ruth's Chris's customers and allows for a secure transaction with no fear of identity theft.

- 31 -

Sal Olivas, Ruth Chris's general manager, said he turned to ON THE SPOT to streamline the payment transaction and serve his customers faster. "When people want to leave the table, they want to leave," he said. "We try to expedite their needs on their timetable.

Olivas said he believes ON THE SPOT will speed his guests' transaction time by five to 10 minutes. "On a busy night, when customers need a table, that will be crucial," Olivas said of the quicker table turns. But he also noted the security benefits for customers: "We're doing this for our guests' sake, for their conveniences, security and peace of mind."

"Ruth's Chris's use of ON THE SPOT shows the versatility of our suite of products," said Paul Rasori, VeriFone's vice president of global product marketing. "In today's environment, payment at the point of service is more important than ever, as operators and patrons want security against identity theft. The additional value the product brings to an operator is greater operational efficiency and profitability as it relates to table turns, server time and processing fees."

ON THE SPOT is designed to cut down on the increasingly common problem of credit card fraud and also allows restaurant operators to take advantage of lower-cost PIN debit payment.

By allowing patrons to slide their own cards rather than handing them to another person, ON THE SPOT virtually eliminates the possibility of a server "skimming" a card and cloning account information. TransUnion has estimated that 70 percent of all skimming takes place in a restaurant environment.

ON THE SPOT uses special encryption and other security features to protect all financial data transacted over a restaurant's Wi-Fi network. These security features are a necessity today, with credit card fraud now the most common form of identity theft, according to the Federal Trade Commission. ON THE SPOT has pioneered the use of Wi-Fi and GPRS cellular communications to provide online payment authorization at the point of service in North American restaurants.

81.    On November 1, 2007, the Individual Defendants caused VeriFone to issue the following press release:

San Jose, CA - November 01, 2007 - VeriFone Holdings, Inc. (NYSE: PAY) announced today that it will report its financial results for the three months ended and fiscal year ended October 31, 2007, on December 6, 2007.

The management of VeriFone will host a conference call on December 6, 2007, at 1:30 p.m. (PST) to discuss VeriFone's fourth quarter and year end results, which will be simultaneously webcast. Management may also provide forward looking guidance on this call.

82.    On November 13, 2007, Zwarenstein sold 17,878 shares of VeriFone stock at approximately $44 per share.

83.    Between November 14, 2007 and November 26, 2007, Bergeron sold 383,197 shares of VeriFone stock at prices between $44.70 and $46.43 per share. On November 30, 2006,

1   Zwarenstein sold 4000 shares of VeriFone stock for proceeds of $133,000. On December 1, 2006,

2   Adams sold 4,945 shares of Verifone stock for proceeds of $164,000. On the same day, Defendant

3   Waller sold 10,000 shares of VeriFone stock for proceeds of $333,000.

4          84.     On December 3, 2007, VeriFone shocked the stock market by announcing the

5   following press release:

6   **VeriFone Announces Anticipated Restatement of 2007 Quarterly Financial Statements**

7   San Jose, CA - December 03, 2007 - *VeriFone Holdings, Inc. (NYSE: PAY) today
8   announced that* following a review by and on the recommendation of management,
    it has concluded that *its unaudited interim consolidated financial statements for the
9   three months ended January 31, 2007, the three and six months ended April 30,
    2007 and the three and nine months ended July 31, 2007 should no longer be
10  relied upon,* principally due to errors in accounting related to the valuation of in-
    transit inventory and allocation of manufacturing and distribution overhead to
11  inventory, each of which affects VeriFone's reported costs of net revenues. The
    restatements are anticipated to correct errors that overstated previously reported
12  inventories in material amounts as of January 31, 2007, April 30, 2007 and July 31,
    2007, and understated cost of net revenues in material amounts for the three month
13  periods ended January 31, 2007, April 30, 2007, and July 31, 2007. Accordingly,
    investors are cautioned not to rely on VeriFone's historical financial statements and
14  earnings press releases and similar communications for the periods ended January 31,
    2007, April 30, 2007, and July 31, 2007.

15
16         Based on its review to date, *management currently anticipates that the
    restatement will result in reductions to previously reported inventories of
17  approximately $7.7 million, $16.5 million and $30.2 million as of January 31,
    2007, April 30, 2007 and July 31, 2007, respectively, and reductions to previously
    reported pre tax income of approximately $8.9 million, $7.0 million and $13.8
18  million for the three month periods ended January 31, 2007, April 30, 2007 and
    July 31, 2007, respectively.* VeriFone is currently evaluating the anticipated effect of
19  the restatement on after-tax income for those periods.

20         These estimates include corrections of other unrelated errors detected in the
    course of VeriFone's review to date, are based on currently available information and
21  are subject to change during the course of the company's restatement process. While
    VeriFone is not currently aware of other accounting errors requiring adjustment to
22  any prior period financial statements, there can be no assurances that VeriFone or its
    independent registered public accounting firm will not find additional accounting
23  errors requiring further adjustments in those or earlier periods.

24         85.     On this news, the Company's shares plummeted by almost 46% to close at

25  approximately $26.03, a dramatic fall from the opening price of $48.03 the preceding business day.

26  The volume of VeriFone shares traded on December 3, 2007 was 49.8 million shares, compared to

27  just 1.4 million shares traded on the preceding trading day.

28

86.    On December 3, 2007, during a conference call with analysts to discuss VeriFone's anticipated restatement of its financial results, and its lower gross margins, Defendant Bergeron conceded that the Lipman acquisition had dramatically increased the magnitude of complexity of several material issues pertaining to VeriFone's earnings.

87.    The true facts, which were known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)    the Company's in-transit inventory was grossly overvalued due to accounting errors related to allocation of manufacturing and distribution overhead to inventory, each of which affects VeriFone's reported costs of net revenues.  This fraud was recently revealed by a cost accounting manager in the Company's Sacramento, California office;

(b)    the Company's gross margins were not 45-47% but were closer to 40%;

(c)    the Company was not on track to achieve profitability in 2007, but rather losses due to problems related to the Company's acquisition of Lipman Electronic Engineering, Ltd. ("Lipman"), which problems the Company discovered during the due diligence pertaining to the Company's acquisition of Lipman in 2006;

(d)    the Company's gross margin projections were overstated;

(e)    the Company's supply chain management was severely deficient;

(f)    the Company's accounting during the Relevant Period was false and misleading;

(g)    the Company lacked adequate internal controls over accounting and financial reporting during the Relevant Period; and

(h)    that as a result of (a)-(g) above, the Company's estimates of an eleventh consecutive quarter of double digit revenue growth for the first quarter of 2007 and income per share growth of 20% or more were grossly inflated and the Company's reported assets and inventory were materially overstated, as described herein.

88.    In its December 3, 2007 revelation of false financial statements, VeriFone also stated that when the Company eventually files the 2007 Form 10-K, and files amended financial statements

1  for previous periods to correct admitted accounting errors, *"management expects VeriFone to*

2  *report one or more material weaknesses in VeriFone's internal controls over financial reporting."*

3  **VERIFONE'S FALSE FINANCIAL**
   **REPORTING DURING THE RELEVANT PERIOD**

4

5        89.    In order to inflate the price of VeriFone stock, defendants caused the Company to

6  falsely report its results during the Relevant Period by grossly overvaluing its inventory and failing

7  to "write down" the value of its inventory in violation of Generally Accepted Accounting Principles

8  ("GAAP").

9        90.    GAAP are those principles recognized by the accounting profession as the

10  conventions, rules and procedures necessary to define accepted accounting practice at a particular

11  time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the

12  SEC which are not prepared in compliance with GAAP are presumed to be misleading and

13  inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial

14  statements must also comply with GAAP, with the exception that interim financial statements need

15  not include disclosure which would be duplicative of disclosures accompanying annual financial

16  statements. 17 C.F.R. §210.10-01(a).

17        91.    The Individual Defendants caused VeriFone to falsify its reported financial results by

18  overstating the value of its inventory and failing to write down its inventory.

19        92.    Due to these accounting improprieties, the Company presented its financial results

20  and statements in a manner which violated GAAP, including the following fundamental accounting

21  principles:

22            (a)    The principle that interim financial reporting should be based upon the same

23  accounting principles and practices used to prepare annual financial statements was violated (APB

24  No. 28, ¶10);

25            (b)    The principle that financial reporting should provide information that is useful

26  to present and potential investors and creditors and other users in making rational investment, credit

27  and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

28

1    (c)    The principle that financial reporting should provide information about the

2  economic resources of an enterprise, the claims to those resources, and effects of transactions, events

3  and circumstances that change resources and claims to those resources was violated (FASB

4  Statement of Concepts No. 1, ¶40);

5    (d)    The principle that financial reporting should provide information about how

6  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

7  for the use of enterprise resources entrusted to it was violated. To the extent that management offers

8  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for

9  accountability to prospective investors and to the public in general (FASB Statement of Concepts

10  No. 1, ¶50);

11    (e)    The principle that financial reporting should provide information about an

12  enterprise's financial performance during a period was violated. Investors and creditors often use

13  information about the past to help in assessing the prospects of an enterprise. Thus, although

14  investment and credit decisions reflect investors' expectations about future enterprise performance,

15  those expectations are commonly based at least partly on evaluations of past enterprise performance

16  (FASB Statement of Concepts No. 1, ¶42);

17    (f)    The principle that financial reporting should be reliable in that it represents

18  what it purports to represent was violated. That information should be reliable as well as relevant is

19  a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

20    (g)    The principle of completeness, which means that nothing is left out of the

21  information that may be necessary to insure that it validly represents underlying events and

22  conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

23    (h)    The principle that conservatism be used as a prudent reaction to uncertainty to

24  try to ensure that uncertainties and risks inherent in business situations are adequately considered

25  was violated. The best way to avoid injury to investors is to try to ensure that what is reported

26  represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

27    (i)    Further, the undisclosed adverse information concealed by defendants during

28  the Relevant Period is the type of information which, because of SEC regulations, regulations of the

1 | national stock exchanges and customary business practice, is expected by investors and securities

2 | analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

3 | be the type of information which is expected to be and must be disclosed.

4 | ## DAMAGES TO THE COMPANY

5 | 93.    As a result of the Individual Defendants' improprieties, VeriFone disseminated

6 | improper statements concerning its business prospects as alleged above. In addition, as a result of

7 | defendants' Relevant Period improprieties, the Company is now the subject of a class action lawsuit

8 | that alleges violations of the federal securities laws.

9 | 94.    As a direct and proximate result of the Individual Defendants' actions as alleged

10 | above, VeriFone's market capitalization has been damaged by over $2.6 billion. At the same time

11 | that the Individual Defendants were causing VeriFone to suffer such devastation of its market

12 | capitalization, the Insider Selling Defendants were profiting by selling over $110 million of their

13 | personally held stock.

14 | 95.    Further, as a direct and proximate result of Individual Defendants' actions, VeriFone

15 | has expended and will continue to expend significant sums of money. Such expenditures include,

16 | but are not limited to:

17 | (a)    Costs incurred to carry out internal investigations, including legal fees paid

18 | to outside counsel;

19 | (b)    Costs incurred in investigating and defending VeriFone and certain officers

20 | in the class actions, plus potentially millions of dollars in settlements or adverse judgment;

21 | (c)    Costs incurred from compensation and benefits paid to the defendants,

22 | which compensation was based at least in part on VeriFone's artificially-inflated stock price and

23 | inflated revenues; and

24 | (d)    Costs incurred from the loss of the Company's customers' confidence in

25 | VeriFone's services.

26 | 96.    The costs VeriFone has incurred due to required internal investigations into the

27 | accounting errors, false financial statements, and insider selling include fees for outside attorneys

28 | (Simpson Thacher & Bartlett, LLP) and forensic accountants (Navigant Consulting, Inc.) to serve as

- 37 -

1  advisors to the internal investigation. The Company's goodwill and reputation have been materially
2  undermined and tarnished.

3       97.    The Individual Defendants' wrongdoing has also significantly damaged VeriFone in
4  that it has caused VeriFone to default on its credit agreements. As a result, the Company has been
5  damaged in that it has been forced to (1) pay significant amounts of money to its lenders in exchange
6  for their agreement to waive the defaults; and (2) pay an extra 0.25% on the interest rate applicable
7  to its term loans and revolving credit agreements. VeriFone and VeriFone Intermediate Holdings,
8  Inc., a wholly-owned subsidiary of VeriFone, are parties to an October 31, 2006 Credit Agreement.
9  VeriFone has defaulted on this Credit Agreement due to its failure to timely file financial statements
10  for the three months ended January 31, 2007, April 30, 2007, July 31, 2007, the year ended October
11  31, 2007, and the three-month period ended January 31, 2008. As a result, VeriFone was forced to
12  enter into a First Amendment to Credit Agreement and Waiver ("First Amendment") with its lenders
13  on January 25, 2008. Pursuant to the First Amendment, VeriFone had to pay its lenders (1) a fee of
14  0.25% of the aggregate amount outstanding under the loans and revolving credit agreements; (2) pay
15  the lenders an increased rate of interest on the term loan – an additional 0.25%; and (3) pay all the
16  legal fees and costs of Fried, Frank, Harris, Shriver & Jacobson LLP (legal counsel to the
17  Administrative Agent of the lenders) relating to the First Amendment.

18               **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

19      98.    Plaintiffs bring this action derivatively in the right and for the benefit of VeriFone to
20  redress injuries suffered, and to be suffered, by VeriFone as a direct result of the breaches of
21  fiduciary duty, waste of corporate assets and unjust enrichment, as well as the aiding and abetting
22  thereof, by the Individual Defendants. VeriFone is named as a nominal defendant solely in a
23  derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would
24  not otherwise have.

25      99.    Plaintiffs will adequately and fairly represent the interests of VeriFone in enforcing
26  and prosecuting its rights.

27
28

1      100.   Plaintiffs are and were owners of the common stock of VeriFone during the time of

2   the transactions complained of herein, and have continuously remained shareholders of the

3   Company.

4      101.   The current Board of VeriFone consists of the following eight individuals: defendants

5   Bergeron, Roche, Castle, Denend, Hart, Henske, Rinehart and Raff.

6      102.   Defendants Henske, Castle, Denend and Rinehart (the "Audit Committee

7   Defendants") were, during the Relevant Period, members of the Audit Committee.  The Audit

8   Committee's charter provides that the Audit Committee is responsible for, among other things: (i)

9   reviewing the Company's quarterly and annual financial statements prior to the filing of such

10  statements; (ii) reviewing the effectiveness of the Company's internal control over financial

11  reporting; and (iii) discussing with management, the internal auditors, and the independent auditors

12  the adequacy and effectiveness of internal control over financial reporting.  Thus, the Audit

13  Committee Defendants were responsible for overseeing and directly participating in the

14  dissemination of VeriFone's financial results and guidance.  The Audit Committee Defendants,

15  however, breached their fiduciary duties of due care, loyalty and good faith because they participated

16  in the preparation of improper financial statements and earnings press releases that contained

17  improper material information.  Particularly, these defendants reviewed and failed to correct

18  VeriFone's improper statements described above.  Thus, the Audit Committee Defendants face a

19  sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any

20  demand upon them futile.

21     103.   As members of the Audit Committee, Defendants Henske, Castle, Denend and

22  Rinehart had the following duties, which they failed to adequately perform:

23          (a)   The Committee shall regularly review with the independent auditors any audit

24  problems or difficulties encountered during the course of the audit work, including any restrictions

25  on the scope of the independent auditors' activities or access to requested information, and

26  management's response. The Committee should review any accounting adjustments that were noted

27  or proposed by the auditors but were "passed" (as immaterial or otherwise); any communications

28  between the audit team and the audit firm's national office relating to problems or difficulties

1  encountered with respect to significant auditing or accounting issues; any "management" or "internal

2  control" letter issued, or proposed to be issued, by the audit firm to the Company; and the form of

3  opinion that the audit firm proposes to render to the Board of Directors and the shareholders.

4          (b)     The Committee shall meet to review and discuss the quarterly financial

5  statements, including reviewing the Company's specific disclosures under "Management's

6  Discussion and Analysis of Financial Condition and Results of Operations," with management and

7  the independent auditors prior to the filing of the Company's Quarterly Report on Form 10-Q. Also,

8  the Committee shall discuss the results of the quarterly review and any other matters required to be

9  communicated to the Committee by the independent auditors under generally accepted auditing

10  standards.

11          (c)     The Committee shall meet to review and discuss the annual audited financial

12  statements, including reviewing the Company's specific disclosures under "Management's

13  Discussion and Analysis of Financial Condition and Results of Operations," with management and

14  the independent auditors prior to the filing of the Company's Annual Report on Form 10-K (or the

15  annual report to shareholders if distributed prior to the filing of Form 10-K).

16          (d)     The Committee's review of the Company's financial statements and

17  disclosures shall include: (i) major issues regarding accounting principles and financial statement

18  presentations, including any significant changes in the company's selection or application of

19  accounting principles, and major issues as to the adequacy of the company's internal controls and

20  any specific remedial actions adopted in light of material control deficiencies; (ii) discussions with

21  management and the independent auditors regarding significant financial reporting issues and

22  judgments made in connection with the preparation of the financial statements and the

23  reasonableness of those judgments, including analyses of the effects of alternative GAAP methods

24  on the financial statements; (iii) consideration of the effect of regulatory accounting initiatives, as

25  well as off-balance sheet structures on the financial statements; (iv) consideration of the judgment of

26  both management and the independent auditors about the quality, not just the acceptability of

27  accounting principles; and (v) the clarity of the disclosures in the financial statements. Also, the

28

1  Committee shall discuss the results of the annual audit and any other matters required to be

2  communicated to the Committee by the independent auditors under professional standards.

3  (e)   The Committee shall receive and review a report from the independent

4  auditors, prior to the filing of the Company's Annual Report on Form 10-K (or the annual report to

5  shareholders if distributed prior to the filing of Form 10-K), on all critical accounting policies and

6  practices of the Company; all material alternative treatments of financial information within

7  generally accepted accounting principles that have been discussed with management, including the

8  ramifications of the use of such alternative treatments and disclosures and the treatment preferred by

9  the independent auditor; and other material written communications between the independent

10  auditors and management.

11  (f)   The Committee shall obtain from the independent auditors assurance that the

12  audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of

13  1934, as amended, which sets forth certain procedures to be followed in any audit of financial

14  statements required under the Securities Exchange Act of 1934.

15  (g)   The Committee shall discuss with appropriate counsel to the Company any

16  significant legal, compliance or regulatory matters that may have a material effect on the financial

17  statements or the Company's business, financial statements or compliance policies, including

18  material notices to or inquiries received from governmental agencies.

19  104.  As a result of their access to and review of internal corporate documents;

20  conversations and connections with other corporate officers, employees and directors; and

21  attendance at management and Board meetings, each of the defendants knew the adverse non-public

22  information regarding VeriFone's accounting practices and financial results. While in possession of

23  this material adverse non-public information regarding the Company, the following current members

24  of the VeriFone Board participated in the illegal insider selling by selling the following amounts:

25  (a)   while in possession of adverse non-public information, Bergeron sold

26  2,254,834 shares of VeriFone stock for proceeds of $78,699,430;

27  (b)   while in possession of adverse non-public information, Castle sold 5,000

28  shares of VeriFone stock for proceeds of $194,300; and

- 41 -

1            (c)    while in possession of adverse non-public information, Roche and Bondy

2    caused GTCR and its affiliates to sell 9,800,000 shares of VeriFone stock for proceeds of

3    $358,550,281.

4    Because these defendants received a personal financial benefit from the challenged insider selling

5    transactions, these defendants are interested.  Moreover, these defendants face a sufficiently

6    substantial threat of liability for breach of their fiduciary duties for insider selling.  Since these

7    directors have breached their fiduciary duties and are interested, any demand upon them is futile.

8          105.    Defendant Roche is a principal of GTCR.  GTCR received significant fees from

9    VeriFone as a result of a Professional Services Agreement. VeriFone pays GTCR millions of dollars

10    in management fees and placement fees relating to debt and equity financing.  VeriFone pays an

11    annual management fee to GTCR of $250,000.  It paid GTCR $2.9 million in 2004 in connection

12    with services GRCR provided relating to a secured credit facility.  Since GTCR is integral to

13    VeriFone's credit facilities, the Company would never authorize suit against Roche, who is a

14    principal of GTCR.

15          106.    VeriFone has also paid significant fees to companies controlled by GTCR. VeriFone

16    paid $1.8 million to Driver Alliant Insurance Services, Inc. and $91,000 to Horn Murdock Cole, both

17    of which entities are controlled by GTCR.

18          107.    Demand is futile as to Roche because Roche is a principal of GTCR, which

19    dominated and controlled VeriFone through its controlling stake in VeriFone.  As of December 31,

20    2006, GTCR and its affiliates owned 20% of the common stock of VeriFone.  VeriFone was also

21    controlled by GTCR because VeriFone borrowed $60 million from GTCR.  In addition, GTCR has

22    the right to designate at least one member of each of the Compensation Committee and Corporate

23    Governance and Nominating Committee.

24          108.    Demand is also futile as to Roche and Bergeron because none of VeriFone's

25    agreements with Bergeron, including his employment agreement, can be modified without GTCR's

26    approval.  VeriFone also may not modify any agreements with other key executives, including Jesse

27    Adams, William Atkinson, David Turnbull, Elmore Waller, Nigel Bidmead, and Robert Lopez,

28    without GTCR's consent.

109.    Bergeron owns 4.2% of all VeriFone's stock. He is the single largest shareholder in the Company.  Moreover, the principal professional occupation of defendant Bergeron is his employment with VeriFone, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, VeriFone paid Bergeron the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $597,313 | $1,500,000 | $1,154,400 | 225,000 | $45,824 |

Accordingly, Bergeron lacks independence from defendants Denend, Henske and Roche, who are not disinterested and/or independent and who exert influence over Bergeron's compensation by virtue of their positions as members of the Compensation Committee.  The Compensation Committee has the authority to review and approve Bergeron's base salary, bonus and equity compensation.  This lack of independence renders defendant Bergeron incapable of impartially considering a demand to commence and vigorously prosecute this action.

110.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

111.    The Director Defendants of VeriFone, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from VeriFone's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

112.    Defendants Castle, Hart and Raff were and are members of VeriFone's Corporate Governance and Nominating Committee. They failed to adequately perform the following duties which they assumed as members of such Committee:

(a)    Establish procedures for the Committee to exercise oversight of the evaluation of the Board and management.

(b)    Develop and recommend to the Board a set of corporate governance principles applicable to the Company, and to review those principles at least once a year.

113.    The acts complained of constitute violations of the fiduciary duties owed by VeriFone's officers and directors and these acts are incapable of ratification.

114.    Each of the Director Defendants of VeriFone authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

115.    Any suit by the current directors of VeriFone to remedy these wrongs would likely expose the Individual Defendants and VeriFone to further violation of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants. Thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

116.    VeriFone has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for VeriFone any part of the damages VeriFone suffered and will suffer thereby.

117.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in the class action complaints for violations of securities laws, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

118.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has filed and refused to seek to recovery for VeriFone for any of the wrongdoing alleged by Plaintiffs herein.

119.    A true and correct copy of this Complaint was delivered to VeriFone prior to it being filed with this Court.

# FIRST CAUSE OF ACTION

### Derivatively Against the Officer Defendants for Violation of
### §10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder

120.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    During the Relevant Period, the Officer Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

122.    The Insider Selling Defendants also sold VeriFone stock as set forth herein, receiving ill gotten gains while in possession of material non-public information. These defendants misappropriated VeriFone's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold VeriFone stock without disclosing the information alleged to have been concealed herein.

123.    During the Relevant Period, at the same time the price of the Company's common stock was inflated by the Officer Defendants' misstatements as alleged herein, and the Insider Selling Defendants were selling stock into the market as alleged herein, the Individual Defendants caused VeriFone to repurchase hundreds of millions of dollars worth of its own stock on the open market at inflated prices.

124.    During the Relevant Period each of the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- 45 -

1        (c)    Engaged in acts, practices and a course of business that operated as a fraud

2    or deceit upon VeriFone in connection with VeriFone's purchases of VeriFone common stock

3    during the Relevant Period.

4        125.   As a result of the Officer Defendants' misconduct, VeriFone has and will suffer

5    damages in that it paid artificially inflated prices for VeriFone common stock purchased on the

6    open market. VeriFone would not have purchased VeriFone common stock at all, or at the inflated

7    prices it paid, had the market been aware that the price of VeriFone's stock was artificially and

8    falsely inflated by the Officer Defendants' misleading statements. As a direct and proximate result

9    of these defendants' wrongful conduct, VeriFone suffered damages in connection with its

10    purchases of VeriFone common stock during the Relevant Period. By reason of such conduct, the

11    Officer Defendants are liable pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated

12    thereunder.

13    **SECOND CAUSE OF ACTION**

14    **Against the Insider Selling Defendants for Violation of**
**California Corporations Code §25402**

15

16        126.   Plaintiffs incorporate by reference and realleges each and every allegation set forth

17    above, as though fully set forth herein.

18        127.   At the time that the Insider Selling Defendants sold their VeriFone common stock as

19    set forth herein, by reason of their high executive and/or directorship positions with VeriFone, the

20    Insider Selling Defendants had access to highly material information regarding the Company,

21    including the information set forth herein regarding the true adverse facts of VeriFone's improper

22    financial reporting.

23        128.   At the time of such sales, that information was not generally available to the public

24    or the securities markets. Had such information been generally available, it would have

25    significantly reduced the market price of VeriFone shares at that time.

26        129.   The Insider Selling Defendants, and each of them, had actual knowledge of

27    material, adverse, non-public information and thus sold their VeriFone common stock in California

28    in violation of California Corporations Code §25402.

1    130.    As a result of the wrongful conduct of the Insider Selling Defendants, VeriFone has

2    been damaged.    Pursuant to California Corporations Code §25502.5, the Insider Selling

3    Defendants, and each of them, are liable to VeriFone for damages in an amount up to three times

4    the difference between the price at which VeriFone common stock was sold by the defendants, and

5    each of them, and the market value which that VeriFone common stock would have had at the time

6    of the sale if the information known to the defendants, and each of them, had been publicly

7    disseminated prior to that time and a reasonable time had elapsed for the market to absorb the

8    information.

9    131.    The Insider Selling Defendants are also liable for reasonable costs and attorney fees

10    pursuant to Cal. Corp. Code §25502.5.

## THIRD CAUSE OF ACTION

### Against the Officer and Director Defendants for Violation of California Corporations Code §25403

132.    Plaintiffs incorporate by reference and realleges each and every allegation contained

above, as though fully set forth herein.

133.    The Officer and Director Defendants, through their positions, exercised control and

influence over the Insider Selling Defendants' sale of VeriFone common stock in violation of the

California Corporations Code.    The Officer and Director Defendants are statutorily liable to the

same extent as the Insider Selling Defendants under California Corporations Code §25403.

134.    The Officer and Director Defendants knowingly provided substantial assistance to

the Insider Selling Defendants.    The Officer and Director Defendants were aware of the Insider

Selling Defendants' knowledge of the material adverse non-public information and the Officer and

Director Defendants were aware of the Insider Selling Defendants' intent to sell VeriFone common

stock while in possession material adverse non-public information.

135.    The Officer and Director Defendants are culpable for the Insider Selling Defendants'

underlying violations of California Corporations Code §25402 because of their knowledge and

ability to control and influence the Insider Selling Defendants.

SHAREHOLDER DERIVATIVE COMPLAINT

136.   Under California Corporations Code §25403, the Officer and Director Defendants, and each of them, are liable to VeriFone for damages in an amount up to three times the difference between the price at which VeriFone common stock was sold by the Insider Selling Defendants, and each of them, and the market value which VeriFone common stock would have had at the time of the sale if the information known to the Individual Defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

**FOURTH CAUSE OF ACTION**

**Against the Officer and Director Defendants for Breach of Fiduciary Duty
for Improper Financial Reporting**

137.   Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.   The Officer and Director Defendants owed and owe VeriFone fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe VeriFone the highest obligation of good faith, fair dealing, loyalty and due care.

139.   The Officer and Director Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

140.   Each of the Officer and Director Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141.   As a direct and proximate result of the Officer and Director Defendants' failure to perform their fiduciary obligations, VeriFone has sustained significant damages. As a result of the misconduct alleged herein, the Officer and Director Defendants are liable to the Company.

142.   Plaintiffs on behalf of VeriFone have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

143.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

144.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold VeriFone common stock on the basis of such information.

145.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold VeriFone common stock.

146.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of VeriFone common stock while in possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

147.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## SIXTH CAUSE OF ACTION

### Against All Individual Defendants for Breach of Fiduciary Duty

148.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    The Individual Defendants' misconduct alleged herein constituted a breach of their fiduciary duties to VeriFone for abuse of control, gross mismanagement, and waste of corporate assets, for which they are legally responsible.

150.   As a direct and proximate result of the Individual Defendants' breaches, VeriFone has sustained significant damages.

151.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.   Plaintiffs on behalf of VeriFone have no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

153.   Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of VeriFone.

155.   Plaintiffs, as shareholders and representatives of VeriFone, seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## EIGHTH CAUSE OF ACTION

### Derivative Claim for Aiding & Abetting Breach of Fiduciary Duties – Against Defendant GTCR Golder Rauner LLC

156.   Plaintiffs repeat and reallege each allegation set forth herein.

157.   Plaintiffs bring this cause of action derivatively on behalf of VeriFone against defendant GTCR Golder Rauner LLC.

158.   As alleged above, the Individual Defendants have breached their fiduciary duties of good faith, fair dealing, and care to VeriFone.

159.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and as part of a common plan and scheme and in breach of their fiduciary duties to VeriFone, have damaged VeriFone through their breaches of fiduciary duty.

160.   GTCR was aware of the breaches of fiduciary duty being committed by the Individual Defendants and gave substantial assistance and encouragement to the Individual

2.      Determining and awarding VeriFone treble damages pursuant to California Corporations Code §25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code §25402;

3.      Determining and awarding VeriFone treble damages against the Officer and Director Defendants pursuant to California Corporations Code §25403;

4.      Directing VeriFone to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VeriFone and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- control and limit insider stock selling;

- a provision to permit the shareholders of VeriFone to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of VeriFone's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- appropriately test and then strengthen the internal audit and control functions.

5.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of VeriFone has an effective remedy;

6.      Awarding to VeriFone restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

7.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1     8.     Granting such other and further relief as the Court deems just and proper.

2                   **JURY DEMAND**

3     Plaintiffs demand a trial by jury.

4   DATED:  March 5, 2008

                                   FRANCIS A. BOTTINI, JR.

6                   JOHNSON BOTTINI, LLP
                     FRANCIS A. BOTTINI, JR.
7                   DEREK J. WILSON
                     655 West Broadway, Suite 1400
8                   San Diego, California  92101
                     Telephone:  619/230-0063
9                   Facsimile:  619/233-5535

                     Attorneys for Plaintiffs

## VERIFICATION

I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my holdings of VeriFone common stock are true based on my personal knowledge. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

*Mary P. Lemmond*

Mary P. Lemmond

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I hereby verify that I am a shareholder of VeriFone Holdings, Inc. (the "Company"). I have reviewed the allegations made in this Derivative Complaint. The allegations concerning me and my holdings of VeriFone common stock are true based on my personal knowledge. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

_____
Wandell Everett

Page
-1-
VERIFICATION

**E-filing**

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Mary Lemmond, Derivatively on Behalf of Verifone Holdings, Inc.

### DEFENDANTS

DOUGLAS G. BERGERON, BARRY ZWARENSTEIN, JESSE ADAMS, ISAAC ANGEL, ELMORE WALLER, COLLIN E. ROCHE, JAMES C. CASTLE, LESLIE G. DENEND, ALEX W. HART, ROBERT B. HENSKE, CHARLES R. RINEHART, EITAN RAFF, WILLIAM G. ATKINSON, CRAIG A. BONDY, GYP GOLDER RAUNER, LLC

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)
**North Carolina**

County of Residence of First Listed Defendant    Verifone Holdings, Inc.
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frank Johnson
JOHNSON BOTTINI, LLP
655 W. Broadway, Ste. 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 233-5535

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities— Employment / ☐ 540 Mandamus & Other | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities— Other / ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 463 Habeas Corpus— Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

Transferred from
Appeal to District

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE". King v. Bergeron, et al., No. C07-06347 **MHP**

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE

DATE   **MARCH 5, 2008**

SIGNATURE OF ATTORNEY OF RECORD